UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

| | | |
|---|---|---|
| JIMMIE LEE WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:03-cv-259 |
| | ) | |
| v. | ) | Honorable Gordon J. Quist |
| | ) | |
| MARY BERGHUIS, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| _____ | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Because Petitioner filed his habeas application after the enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).

Petitioner is serving two concurrent terms of 20 to 40 years and a consecutive term of two years, imposed by the Kent County Circuit Court on April 23, 1998, after a jury convicted Petitioner of two counts of assault with intent to commit murder, Mich. Comp. Laws § 750.83, and one count of possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b. In his *pro se* petition, Petitioner raises fifteen grounds for relief, as follows:

I.    THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN DEFENDANT'S CONVICTION OF ASSAULT WITH INTENT TO MURDER, WHERE THE EVENTS AND CHRONOLOGY SURROUNDING THE DEFENDANT'S RELEASE FROM THE HOSPITAL MADE IT VIRTUALLY IMPOSSIBLE FOR HIM TO HAVE BEEN AT THE SCENE OF THE CRIME; AND WHERE, BECAUSE OF THE HOSTILITY OF THE IDENTIFYING WITNESSES TOWARD THE DEFENDANT, AND THE CONTRADICTIONS IN THEIR TESTIMONY, THE

IDENTIFICATION OF MR. WILLIAMS AS THE PERPETRATOR FAILED TO MEET THE REQUIRED STANDARD OF PROOF BEYOND A REASONABLE DOUBT.

II.     THE JURY VERDICT WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE, WHERE THE EVENTS AND CHRONOLOGY SURROUNDING THE DEFENDANT'S RELEASE FROM THE HOSPITAL MADE IT VIRTUALLY IMPOSSIBLE FOR HIM TO HAVE BEEN AT THE SCENE OF THE CRIME; AND WHERE, BECAUSE OF THE HOSTILITY OF THE IDENTIFYING WITNESSES TOWARD THE DEFENDANT, AND THE CONTRADICTIONS IN THEIR TESTIMONY, THE IDENTIFICATION OF MR. WILLIAMS AS THE PERPETRATOR WAS WHOLLY INCREDIBLE, AND THE JURY VERDICT OF GUILTY REPRESENTS A MISCARRIAGE OF JUSTICE.

III.    WHERE THE PROSECUTOR AGGRESSIVELY DENIGRATED THE DEFENDANT'S RIGHTS AGAINST SELF-INCRIMINATION BEFORE THE JURY, WHERE THE TRIAL COURT'S CURATIVE INSTRUCTION COMPOUNDED THE DAMAGE TO THE DEFENDANT, AND WHERE THE PROSECUTOR PERSISTENTLY MISREPRESENTED THE EVIDENCE IN HIS CLOSING ARGUMENT, THE DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL.

IV.    DEFENDANT JIMMIE WILLIAMS WAS DENIED DUE PROCESS AND A FAIR TRIAL, WHERE THE IMPARTIALITY OF THE JURY WAS COMPROMISED BY FALSE STATEMENTS BY ONE JUROR TO THE OTHER JURORS, DESCRIBING ALLEGED MISCONDUCT OF THE DEFENDANT OUTSIDE THE COURTROOM, WHERE IT WAS CLEARLY DEMONSTRATED BY THE CUSTODIAL SHERIFF'S DEPUTY THAT NO SUCH MISCONDUCT OCCURRED, WHERE THE COURT MADE INSUFFICIENT INQUIRY AS TO THE EXTENT OF JURY CONTAMINATION, AND WHERE THE COURT DECLINED TO TAKE CURATIVE ACTION BEFORE THE JURY DELIBERATED.

V.     THE DEFENDANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR APPEAL WHERE THE TRIAL COURT DENIED HIS POST-JUDGMENT MOTION FOR AN EVIDENTIARY HEARING AND APPOINTMENT OF AN INVESTIGATOR, AND THIS COURT DENIED HIS MOTION FOR REMAND ON THE SAME ISSUES.

VI.    THE CUMULATIVE ERRORS IN THE DEFENDANT'S TRIAL HAD THE EFFECT OF DENYING THE DEFENDANT DUE PROCESS.

VII.    THE COURT'S MINIMUM SENTENCE OF TWENTY YEARS WAS DISPROPORTIONATE AND AN ABUSE OF SENTENCING DISCRETION.

VIII.   WHERE THE COURT ABUSED ITS DISCRETION DURING ARRAIGNMENT IN ALLOWING AN AMENDMENT OF THE INFORMATION, AND AUTHORIZING THE ADDITION OF A NEW CHARGE, CREATING A STRUCTURAL/PROCEDURAL DEFECT WITHIN THE TRIAL PROCEEDINGS, AND DENYING DEFENDANT'S RIGHT TO A FAIR TRIAL.

IX.     WHERE TRIAL'S [SIC] COUNSEL'S INEFFECTIVE REPRESENTATION FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS, AS COUNSEL DID NOT FUNCTION AS COUNSEL GUARANTEED DEFENDANT BY THE SIXTH AMENDMENT, COUNSEL'S PERFORMANCE PREJUDICED THE DEFENSE WHERE COUNSEL'S ERRORS WERE SO SERIOUS THE DEFENDANT WAS DEPRIVED OF A FAIR TRIAL.

X.      WHERE THE PROSECUTION LACK OF DUE DILIGENCE AS IT IS THE DUTY OF THE PROSECUTION TO SHOW THE WHOLE TRANSACTION OF A CRIMINAL PROCEEDING THE PROSECUTION FAIL TO PRODUCE A RES GESTAE WITNESS, AND KNOWN ENDORSED WITNESSES, AS THE RESOURCES AVAILABLE TO THE PROSECUTION IN LOCATING WITNESSES ARE FAR MORE EXTENSIVE IN CRIMINAL PROCEEDINGS.

XI.     WHERE THE JUDGES ABUSED THEIR DISCRETION IN THE PRELIMINARY AND TRIAL PROCEEDINGS, THE TRIAL JUDGE WAS BIAS AND PREJUDICE THE DEFENSE WITH THE COURTS COMMENTS AND ALLOWED A JURORS PERJURED STATEMENT TO DISCUSSED DURING JURY DELIBERATION AND THEN ACCEPTING THE VERDICT.[1]

XII.    WHERE INEFFECTIVE ASSISTANCE OF APPELLANT COUNSEL DENIED DEFENDANT AN EFFECTIVE FIRST APPEAL OF RIGHT, AS APPELLANT COUNSEL FAILED TO RAISE ISSUES THAT HAD FACTUAL MERITS AND WHICH WOULD HAVE LIKELY RESULTED IN A REVERSAL OR AN [SIC] NEW TRIAL IF PRESENTED.

---

[1]Any punctuation and grammatical errors contained in this claim are taken from the original.

- 3 -

XIII.   WHERE THE DEFENDANT'S DUE PROCESS RIGHTS WERE VIOLATED AS POLICE DISPLAYED TO THE VICTIMS, AN IMPROPER SUGGESTIVE PHOTO ARRAY, IN THAT THE POLICE USED A BLOWN-UP PHOTOGRAPH OF THE DEFENDANT FOR IDENTIFICATION, WHICH STANDS OUT FROM THE FIVE OTHER REGULAR SIZE PHOTOGRAPHS IN THE ARRAY, AND SUGGESTED TO THE VICTIMS, THE DEFENDANT WAS MORE LIKELY TO BE THE CULPRIT.

XIV.   A MISCARRIAGE OF JUSTICE OCCURRED WHEN WITNESSES' TRIAL TESTIMONY, IN EXCHANGE FOR STATE IMMUNITY, WAS NOT SAFE GUARDED AGAINST DEFENDANT'S RIGHT TO A FAIR TRIAL WHERE THE AGREEMENTS WERE NEVER DISCLOSED, CROSS-EXAMINED, OR JURY INSTRUCTED.

XV.   APPELLATE COUNSEL WAS INEFFECTIVE ON DIRECT APPEAL, WHERE COUNSEL FAILED TO RAISE ISSUES WITH MERIT, WHERE AN EVIDENTIARY HEARING IS NEEDED.

XV(A).   WHERE TRIAL COUNSEL OBJECTED AT TRIAL TO THE STATES FAILURE TO COMPLY WITH THE DISCOVERY ORDER THAT RENDERED TRIAL COUNSEL'S ABILITY NOT TO DISCOVER THE EXISTENCE OF A RES GESTAE WITNESS TO THE CRIMINAL EVENTS, AND THE FAILURE TO PROVIDE COUNSEL WITH THE REPORTS PREJUDICE DEFENDANT.

XV(B).   THE PROSECUTOR IMPROPERLY URGED THE JURY TO DISCREDIT DEFENDANT'S DEFENSE BECAUSE DEFENDANT'S ALIBI WITNESS DID NOT GO TO THE POLICE, AND EXPRESS HIS PERSONAL OPINION AS THE GUILT [SIC], INVITED THE JURY TO APPLY THE WRONG BURDEN OF PROOF.

Respondent has filed an answer to the petition (docket # 12) stating that the grounds should be denied because they are either procedurally defaulted, noncognizable state law claims, or have no merit. Upon review and applying the AEDPA standards, I find that Petitioner's claims are either noncognizable state-law claims, procedurally defaulted, or without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from the May 4, 1997, shooting of a firearm at Keith Wilson and his friend, John Jones, in Grand Rapids, Michigan.  Only Jones was injured in the shooting.  Petitioner was charged with two counts of assault with intent to commit murder and one count of felony-firearm.  Petitioner was tried before a jury beginning December 15, 1997, and concluding on December 18, 1997.

The first person to testify at trial was Keith Wilson.  (Tr. II, 88.)  Wilson testified that he and John Jones had known each other for four or five years.  When he arrived in town to visit Jones, he became aware of an argument involving Jones' car, which was parked on the street.  Wilson understood that someone was trying to steal parts from the car.  (Tr. II, 91-93.)  When the argument escalated into a fight, Wilson joined in.  Petitioner was knocked to the ground, and Wilson admitted kicking him a couple of times, once in the face and once possibly in the ribs.  (Tr. II, 93, 109-10.)  Petitioner was accompanied by another person who repeatedly asked for all participants to get along. Both Petitioner and the other person eventually ran off, around the corner.  (Tr. II, 94.) Some hours later, Wilson and Jones were attempting to start a motorcycle and were pushing it up the street.  A dark blue or black car pulled up and the person inside asked if they needed help.  They replied that they did not need help.  The person then said, "I got you motherfuckers," and started shooting. (Tr. II, 95.)  Both ran towards Jones' home.  Wilson was not hit, but Jones was shot in the back.  (Tr. II, 95, 102.)

Wilson testified that sometime thereafter he was shown two photographic lineups. He identified someone in the first lineup as being familiar to him.  In the second lineup, he identified

- 5 -

Petitioner as the shooter.  (Tr. II, 104-05.)  On cross-examination, Wilson admitted that he initially

lied to the police about having been involved in the earlier fight.  (Tr. II, 106.)   Wilson

acknowledged that he hit Petitioner five or six times, as well as kicked him.  (Tr. II, 111.)  Wilson

also acknowledged that, at the preliminary examination, he identified two people as the shooter.  (Tr.

II, 116-18.)

   Grand Rapids Police Officer Mark Waichum testified that, after being called to the

scene of the shooting, he located four shell casings in the middle of the street.  (Tr. II, 140-41.)  John

Jones then took the stand.  Jones testified that on the afternoon of the shooting, he saw two  men

looking under the hood of his car, which was parked on the street.  (Tr. II, 145.)  Jones identified

Petitioner as one of the men and his brother, Willie Floyd McIntosh, as the other.  (Tr. II, 146.)

Jones testified that he approached the men and asked why they were stealing parts from his car.

Petitioner replied that the junk man, Jimmy Hill, had sent them down to get what he needed off the

car.  Petitioner owned the same make, model and year of car as Jones.  Jones told Petitioner that he

owned the car.  (Tr. II, 147-48.)  The parties began to argue and then fight.  Other people joined in,

including Keith Wilson.  (Tr. II, 149.)  Jones testified that the fight went on for fifteen minutes and

that, as he was leaving, Petitioner told him he would be back to get him.  (Tr. II, 149.)  Jones then

ran after Petitioner and started kicking him in the back.  Jones' mother told Petitioner, "That's what

you get for taking parts off my baby's car."  (Tr. II, 150.)  When Petitioner tried to pick up a brick,

Jones began kicking him in the head and face.  (Tr. II, 150.)  Jones testified that he believed

Petitioner was picking up the brick to hit Jones' mother.  (Tr. 150, 151.)  Petitioner and his brother

went to Michael Cox's house.  (Tr. II, 152.)  Jones testified that he was worried that Petitioner would

return and shoot him.  (Tr. II, 153.)  He went away for a time and had a motor put into another of his

cars.  (Tr. II, 154.)  He then returned home and allowed Wilson to ride his motorcycle, which kept

stalling.  Jones drove along in another car with Dave Clemens and "Base," a friend of Wilson's.  (Tr.

II, 154-55.)  Eventually, Jones got out of the car to see if he could help with the motorcycle.  (Tr. II,

155-56.)  A dark blue Lincoln pulled up.  Petitioner asked from the vehicle if he could help.  When

Jones told him he did not need help, Petitioner said, "I got you M-F," and started shooting.  (Tr. II,

156-57.)  Jones began to run as soon as he saw the gun, but he was shot in the back as he ran.  (Tr.

II, 157.)  Jones ran into his house and, after the others saw the bleeding, an ambulance was called

and Jones was taken to the hospital.  (Tr. II, 158.)  At the hospital, Jones was treated and released.

(Tr. II, 158.)  Jones subsequently identified Petitioner from several photo arrays shown by the police.

(Tr. II, 162.)

On cross-examination, Jones denied having first told police officers that Michael Cox

was the shooter.  (Tr. II, 163.)  He admitted, however, that he told them that Cox was a suspect and

that he did not mention Petitioner until 45 minutes later.  (Tr. II, 163.)  He claimed to have told

officers that Petitioner had threatened his mother with a brick, but he could not remember on what

occasion. (Tr. II, 164-65.)  He admitted that he lied to the police about having beaten Petitioner.  (Tr.

II, 183-85.)  Jones testified that he looked at Petitioner for about 30 seconds when he first stopped

the car and saw Petitioner's long hair and only one bruise.  He did not see a hat.  (Tr. II, 187.)

Dr. William Schmuggerow testified that he had treated Petitioner at the hospital on

May 4, 1997 for a broken rib and bruises and abrasions to the forehead and other parts of the body.

(Tr. II, 193.)  Petitioner was given an injection of Toradol, a non-narcotic, anti-inflammatory pain

medication.  (Tr. II, 193.)  Petitioner was given x-rays and a CT scan.  (Tr. II, 196.)  Schmuggerow

instructed Petitioner on treating his rib with ice and was given a prescription for Darvocet.  (Tr. II,

193-94, 196.)  Petitioner was registered at the hospital at 5:20 p.m. and was discharged at 7:45 p.m. (Tr. II, 194.)  At the time of his release, Petitioner had a compression bandage around his head and ear.  (Tr. II, 195.)

The next witness was Robin Roberts, a friend of Keith Wilson, who had traveled from Three Rivers with Wilson to visit Jones in Grand Rapids.  (Tr. II, 198.)  At the time of the shooting, he was in Jones' car and Wilson was trying to ride Jones' motorcycle.  Jones got out of the car to see if he could help get the motorcycle started.  (Tr. II, 199.)  He saw a dark four-door car, probably a Lincoln, pull up by Jones and Wilson.  He saw them talk to someone in the car, and then he saw the shooting start.  (Tr. II, 199.)  The car he was in drove the opposite way and Wilson and Jones ran toward the house.  (Tr. II, 199.)  He returned to the house and waited for the ambulance to arrive. After Jones was taken to the hospital, Roberts and Jones left the house.  (Tr. II, 201.)  Roberts was not present at the earlier fight.  (Tr. II, 201.)

Jones' mother, Belle King, testified that she went outside when she heard that her son was in a fight.  She ran up and told Petitioner that he should not take parts off the car.  Petitioner picked up a brick and John Jones knocked him down and continued to fight.  (Tr. II, 204-05.)  When Petitioner left, she heard him threaten to come back and get her son.  (Tr. II, 209.)  She took her son home and found that Renaldo, a friend of the family, was there.  (Tr. II, 206.)  She and Renaldo were riding around and they came up Dickinson Street and saw Petitioner standing on the passenger side of an old brown Cadillac, holding a red towel on his face.  (Tr. II, 206-07.)  She saw a man, who Renaldo identified as Michael Cox, come out of the house with a gun in his hand.  (Tr. II, 207.)  On cross-examination, King admitted that she never told the police about the earlier fight or that Petitioner had picked up a brick.  (Tr. II, 215.)  She testified that the police never asked her any

questions.  She only saw the police when she looked at the photograph arrays they brought to her home.  (Tr. II, 215.)  She further acknowledged that she was not sure whether Petitioner actually picked up the brick or just reached toward it.  (Tr. II, 217.)

Michael Cox testified that he was at home at about 3:30 on May 4, 1997, when Petitioner started banging on his door.  Petitioner asked Cox for a ride home.  Cox offered instead to drive Petitioner to the hospital.  He gave Petitioner a wet towel because he was very bloody.  (Tr. III, 237-38.)  Petitioner's brother, Willie McIntosh arrived shortly thereafter.  Petitioner asked Cox to drop McIntosh at Bennie Clay's place and to have Petitioner's car towed home.  (Tr. III, 238.)  Cox dropped off McIntosh and then took Petitioner to the hospital.  (Tr. III, 239.)  After dropping Petitioner off, Cox drove home.  (Tr. III, 240.)

The final witness for the prosecution was Detective Chris Postma.  Postma testified that he was assigned to investigate the shooting.  He spoke with Jones at the police department, taking some nicknames of the persons involved, including Petitioner's.  (Tr. III, 245, 247.)  He later conducted a photo drop at Jones' home.  Postma showed Jones two groups of six photographs, and Jones identified Petitioner in the second group.  (Tr. III, 246, 249.)  Postma later showed two six-person photo drops to Wilson, who also identified Petitioner.  (Tr. III, 251.)  Postma questioned Petitioner, who stated that he had been referred by "Jimmy the Junk Man" to check an abandoned car to see if certain parts would line up with his vehicle, which had been damaged in an accident.  (Tr. III, 254-55.)  When asked about the shooting, Petitioner told Postma that he did not know anything about it.  Petitioner stated that he had been in the hospital and then left for Mississippi.  Postma testified that after a few specific questions, Petitioner abandoned his story about Mississippi.  (Tr. III, 255-56.)  On cross-examination, Postma testified that Jones had changed his information

about suspects from the original documentation.  (Tr. III, 258.)  He also originally stated that the vehicle involved was green.  (Tr. III, 260.)  Postma also denied showing Jones hundreds of pictures on a computer screen, as Jones had testified.  (Tr. III, 260.)  Postma testified that the shooting occurred at 8:15 p.m., only one-half hour after Petitioner was released from the hospital.  (Tr. III, 267.)  Postma acknowledged that he never spoke with the witnesses Petitioner claimed brought him home from the hospital, nor did he speak with Jimmy Hill, the junk man.  (Tr. III, 268-70.)

During Postma's cross-examination testimony, the prosecutor made the following objection:

Mr. Crozier:  Your, Honor, at this point I'm going to object.  I can't help but notice the defendant at this point shaking his head, making noises with respect to this detective's testimony.  If the defendant wishes to take the stand –

Mr. Grace:  Judge –

Mr. Crozier:  – and give his side of the story, fine.

(Tr. III, 274.)  At this juncture, defense counsel sought a side-bar conference.  The judge excused the jury and defense counsel moved for a mistrial based on the prosecutor's improper reference to Petitioner's right to remain silent.  (Tr. III, 275.)  The court chastised the prosecutor for the improper reference and offered to re-instruct the jury on Petitioner's right to remain silent.  (Tr. III, 278-79.)  Upon defense counsel's request, the court extensively instructed the jury about defendant's right to remain silent and advised the jury to completely disregard the prosecutor's suggestion to the contrary.  The court also advised that it had not observed movements or comments by Petitioner, but had instructed Petitioner to avoid such movements.  The court further advised the jury to disregard any such movements.  The court asked and received the assurance of the jurors that they would not

hold it against Petitioner if he decided not to testify.  (Tr. III, 283-85.)  After Postma completed his testimony, the prosecution rested its case.  (Tr. III, 291.)

Petitioner called two witnesses for the defense.  The first witness was Willie Floyd McIntosh, Petitioner's half brother.  (Tr. III, 291, 294.)     McIntosh testified that he was with Petitioner when he was beaten by Jones on the afternoon of May 4, 1997.  (Tr. III, 292.)  McIntosh testified that he and Petitioner were looking at a two-tone green Cadillac with police stickers on it. Petitioner wanted to look at whether some of the wires on the vehicle would match up with those on Petitioner's vehicle.  According to McIntosh, the hood was cracked open when they arrived and McIntosh lifted the hood.  (Tr. III, 292.) While they were looking at the wiring, a young man drove up and told Petitioner to put back whatever he had taken off the car.  Petitioner told him he hadn't taken anything.  The man stated that he would be back and went down the street.  He then returned with another man.  Jones took half of a tree or bush and swung at Petitioner.  (Tr. III, 293.)  The other man told Jones, "No, don't do that."  (Tr. III, 294.)  After Jones swung, the other man hit Petitioner.  (Tr. III, 294.)  Petitioner got into his own car.  The other man jumped on top of Petitioner's car and stomped through his sun roof.  (Tr. III, 295.)  Petitioner got back out of the car and told the other man to stop stomping his roof.  The man approached Petitioner again.  Petitioner ran away while McIntosh held the man, preventing him from hitting Petitioner.  Jones came after Petitioner with a big piece of metal and tried to hit Petitioner with it.  Petitioner was climbing over the fence.  Jones hit McIntosh in the back with the metal and then chased Petitioner.  (Tr. III, 295-96.)  The other man jumped into Jones' car and caught Petitioner at the corner.  By the time McIntosh caught up, Jones and two other men were beating and kicking Petitioner in the face, back and ribs.  (Tr. III, 297.)  McIntosh pushed the taller one back, telling him to leave Petitioner alone.

- 11 -

(Tr. III, 297.)  McIntosh testified that a woman was down near the sidewalk some 30 feet away. McIntosh denied that Petitioner had made any threatening movements toward the woman, stating that Petitioner could not even get up.  (Tr. III, 298.)  The men began to walk away, and McIntosh helped Petitioner get to his feet.  (Tr. III, 299.)  They went to Michael Cox's home.  Cox gave Petitioner a towel and told him he would drive him to the hospital.  (Tr. III, 299.)  McIntosh went to get a tow truck to get Petitioner's car.  (Tr. III, 299-300.)  He later went to the hospital, staying until Petitioner was released at about 8:00.  He, Petitioner, Petitioner's girlfriend, Delores Lewis, and a stepdaughter, Irene left the hospital around 8:00 p.m.  (Tr. III, 300.)  McIntosh testified that when Petitioner left the hospital, he had large white bandages on his head, ribs and arm.  Petitioner could not use his right arm much.  (Tr. III, 300.)  McIntosh drove all four to Delores' home.  (Tr. III, 302.) Petitioner went immediately to bed, and when McIntosh left five minutes later, Petitioner was lying in the bed talking with Delores and Irene.  (Tr. III, 302, 311-12.)

Delores Lewis testified that McIntosh drove her to the hospital and she spent about three hours there before Petitioner was released.  (Tr. III, 313-14.)  When Petitioner left the hospital, he had a bandage wrapped around his head, above the eyebrows.  Lewis testified that she, her daughter, McIntosh and Petitioner went back to her house, with McIntosh driving.  She and her daughter put Petitioner to bed.  Petitioner was very stiff and bent over, holding his side.  He went to bed without even removing his coat and fell asleep.  (Tr. III, 316-17.)  Lewis stayed on the couch in the dining room for the remainder of the evening and Petitioner did not leave the house that evening.  She testified that she is a light sleeper and she got up several times when Petitioner called her to help him to the bathroom.  (Tr. III, 325.)  Petitioner did not leave the house for three or four days.  (Tr. III, 318.)

- 12 -

At the conclusion of trial, on December 18, 1997, the jury found Petitioner guilty of two counts of assault with intent to commit murder and one count of possession of a firearm during the commission of a felony.  (Tr. IV, 382.)  On April 23, 1998, Petitioner was sentenced as an habitual offender, second offense, MICH. COMP. LAWS § 769.10, to serve two concurrent terms of 20 to 40 years on the assault convictions and a consecutive term of two years on the felony-firearm conviction.  (Docket #16.)

### B.  Direct Appeal

On April 27, 1998, Petitioner filed a notice of appeal as of right to the Michigan Court of Appeals.  On February 11, 1999, appellate counsel filed a motion for new trial and evidentiary hearing and requested the appointment of an investigator at county expense.  That motion was denied on February 11, 1999.  Petitioner's brief on appeal, filed by counsel on September 9, 1999, raised seven issues, which correspond with grounds I through VII of his habeas petition.  (See Def.-Appellant's Br. on Appeal, docket #21.)  In addition, Petitioner filed a *pro per* supplemental brief on appeal, in which he raised an additional six issues, which correspond with grounds VIII through XIII of the habeas petition.  (See Standard 11 Supp. Br. on Appeal, docket #21.)  By unpublished opinion issued on April 28, 2000, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (See 4/28/00 Mich. Ct. App. Opinion ("MCOA Op."), docket #21.)  Petitioner sought rehearing, which was denied on July 6, 2000.

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same thirteen claims raised before and rejected by the Michigan Court of Appeals.  Petitioner also sought leave to add one new issue, which corresponds with ground XIV of the habeas petition.  By order entered January 30, 2001, the Michigan Supreme Court denied his

application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See Mich. Ord., docket #22.)

### C. Post-conviction relief

Petitioner filed a motion for relief from judgment on January 7, 2002, in which he raised six issues.  The first issue corresponds with the issue raised for the first time in the Michigan Supreme Court, habeas ground XIV.  The sixth issue corresponds with habeas ground XV.  The remaining four issues repeat issues previously raised in his pro per supplemental brief on direct appeal.  On January 10, 2002, the Kent County Circuit Court denied the motion on the basis of MICH. CT. R. 6.508(D)(2) and (D)(3).  (Petition, App. J.)  Petitioner sought leave to appeal to both the Michigan Court of Appeals and the Michigan Supreme Court.  Both courts denied leave to appeal because Petitioner had failed to meet the burden of demonstrating entitlement to relief under MICH. CT. R. § 6.508(D).  (Docket ##23, 24.)  The Michigan Supreme Court entered its order denying leave on February 28, 2003.  (Docket #24.)

Petitioner filed the instant petition on April 16, 2003.

### Standard of Review

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001), *cert. denied*, 536 U.S. 911 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

- 14 -

established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert denied*, 124 S. Ct. 535 (2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.    Ground 1: Sufficiency of the Evidence

Petitioner alleges that the evidence was insufficient to sustain his conviction for assault with intent to murder because the chronology of his admission and release from the hospital rendered his presence at the scene a virtual impossibility. Specifically, given his recorded release time of 7:45 p.m. and the report of the shooting at 8:15 p.m., he alleges that he could not reasonably have reached the scene and committed the conduct. In addition, in light of his condition upon release, he could not have engaged in the alleged conduct. He argues that the clear objective

- 16 -

evidence runs against any finding of guilt, especially in light of the motive of the victim to fabricate Petitioner's guilt to coverup the earlier beating.

A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-402 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Although the time between Petitioner's release from the hospital and the shooting provided only a relatively narrow window for Petitioner to commit the offense, according to the testimony of Detective Postma, the chronology did not make the crime impossible. (Tr. III, 267.) Petitioner was identified by both victims of the shooting, and he had a motive to retaliate for the prior beating. The jury was fully aware of the victims' possible motivation to lie to cover up the earlier beating. It was for the jury to determine whether Petitioner and his witnesses truthfully described his condition and conduct following his release and whether that testimony was more credible than the testimony of the victims. A rational trier of fact could have found Petitioner guilty on the evidence presented. *See Jackson*, 443 U.S. at 319.

- 17 -

II.     Ground 2: <u>Against Great Weight of the Evidence</u>

Petitioner's second ground for habeas relief is not cognizable in this proceeding.  No constitutional authority exists for this Court to review a jury verdict to determine whether it is against the great weight of the evidence.  As long as sufficient evidence was produced to support the conviction, a question the Court previously has answered in the affirmative, the verdict is not subject to constitutional challenge.

Instead, the question presented – whether the great weight of the evidence required the trial court to grant a new trial – is solely one of state law.  *See Peters v. Anderson*, No. 96-3436, 1997 WL 225497, at *1 (6th Cir. May 1, 1997) (holding that whether state court denial of new trial constituted an abuse of discretion was solely a question of state law).  The Court may entertain an application for habeas relief on behalf of a person in custody pursuant to the judgment of a State court in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES).  It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions.  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991);  *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

III.    Ground 3: <u>Prosecutorial Misconduct</u>

In his third ground for habeas relief, Petitioner contends that the prosecutor improperly undermined his right against self-incrimination by suggesting that he was required to take the stand.  Petitioner further argues that he was denied a fair trial by the prosecutor's persistent misrepresentation of the evidence during closing argument.

Misconduct by a prosecutor can rise to the level of a due process violation.  For relief to be granted, the prosecutorial misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  The Court has emphasized a series of factors to be evaluated in determining whether prosecutorial misconduct so infected the trial as to amount to a violation of due process:  (1) whether the comments were isolated or pervasive, (2) whether they were deliberately or accidentally placed before the jury, (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence, (5) the strength of the overall proof establishing guilt, (6) whether the remarks were objected to by counsel and (7) whether a curative instruction was given by the court.  *See Darden*, 477 U.S. at 182-83; *United States v. Young*, 470 U.S. 1, 12-13 (1985); *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

## A.      Reference to right to remain silent

As previously summarized in the recitation of facts,  Petitioner challenges an objection made by the prosecutor during witness Postma's cross-examination testimony:

> Mr. Crozier:  Your, Honor, at this point I'm going to object.  I can't help but notice the defendant at this point shaking his head, making noises with respect to this detective's testimony.  If the defendant wishes to take the stand –

> Mr. Grace:  Judge –

> Mr. Crozier:  – and give his side of the story, fine.

- 19 -

(Tr. III, 274.)  Defense counsel immediately sought a side-bar conference.  The judge excused the jury and defense counsel moved for a mistrial based on the prosecutor's improper reference to Petitioner's right to remain silent.  (Tr. III, 275.)  The court chastised the prosecutor for the improper reference and offered to re-instruct the jury on Petitioner's right to remain silent, though it denied the motion for mistrial.  (Tr. III, 278-79.)  Upon defense counsel's request, the court extensively instructed the jury about defendant's right to remain silent and advised the jury to completely disregard the prosecutor's suggestion to the contrary.  The court also advised that it had not observed movements or comments by Petitioner, but had instructed Petitioner to avoid such movements.  The court further advised the jury to disregard any such movements.  The court asked for and received the assurance of the jurors that they would not hold it against Petitioner if he decided not to testify.  (Tr. III, 283-85.)

The Michigan Court of Appeals addressed the question as follows:

Defendant next argues that the prosecutor committed error requiring reversal when he made a statement that implicated defendant's right to remain silent and that the trial court should have granted a mistrial based on the prosecutor's improper comment.  We agree that the prosecutor's comment was improper.  The trial court, realizing that the comment was improper, admonished the prosecutor and gave a cautionary instruction to the jury.

Constitutional errors such as this are subject to review to determine if the beneficiary of the error can show that the error is harmless beyond a reasonable doubt.  *People v. Anderson*, 446 Mich 392, 405-406; 521 NW2d 538 (1994).  In order to demonstrate that an error is harmless beyond a reasonable doubt, it must be proved that there was no reasonable possibility that the error contributed to the conviction.  *Id.*  The error must be assessed in the context of the other evidence presented at trial.  *Id.*

After reviewing the entire record and considering the statement itself in the context of the other evidence, we conclude that the error was harmless beyond a reasonable doubt.  It did not contribute to the verdict.  There was substantial evidence to support defendant's conviction.  In addition, the issue of defendant's right to

- 20 -

remain silent was not raised or emphasized at any other time during trial.  Moreover the prosecutor's statement was not inculpatory.  And, immediately after defendant moved for a mistrial based on the statement, the trial court issued a cautionary instruction and ascertained from the jury that it understood that the defendant had an absolute right not to testify and that if he exercised his right it must not be held against him.

(4/28/00 MCOA Op. at 2.)

The decision of the Michigan Court of Appeals was a reasonable application of established Supreme Court precedent.  The court of appeals properly concluded that the prosecutor's remarks constituted impermissible commentary on Petitioner's right to remain silent. *See Griffin v. California*, 380 U.S. 609, 625 (1965) (holding that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt").  However, constitutional error requires reversal only if it is not harmless.  *Penry v. Johnson*, 532 U.S. 782, 784 (2001).  In order for this court to find that the admission of this evidence was not harmless, we must find that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict."  *See Nevers v. Killinger*, 169 F.3d 352, 371 (6th Cir. 1999) (holding that *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), standard continues to apply on habeas review even after the amendments to the AEDPA); *see also Penry*, 532 U.S. at 784 (applying *Brecht* standard in § 2254).  The habeas petitioner must establish that the error resulted in actual prejudice.  *McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir. 2000).

Here, as the Michigan Court of Appeals found,[2] the trial court immediately responded to the prosecutor's statement, excusing the jury and chastising the prosecutor.  The court then provided careful instruction to the jury about Petitioner's right to remain silent and interrogated the

---

[2]The findings made by the court of appeals to support its conclusion are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); *Sumner v. Mata*, 449 U.S. 539, 546 (1981).

jurors to ascertain that they understood that Petitioner's silence could not be used against them.  In the face of the clear and prompt instructions and the isolated nature of the reference, the determination by the Michigan Court of Appeals that the error was harmless clearly was reasonable.[3]

### B.     Misrepresentations during closing arguments

Petitioner contends that the prosecutor committed misconduct during his closing and rebuttal arguments.  First, he complains that the prosecutor argued that Petitioner "was caught taking parts from the victim's car, [and] the victim took the law into his own hands."  (Tr. III, 333.) Petitioner asserts that the argument was improper because the testimony did not indicate that any parts actually were taken from the car.

Second, Petitioner complains that the prosecutor improperly argued that Petitioner's first alibi was that he was in Mississippi at the time of the shooting.  Defense counsel objected that the evidence was that Petitioner stated that he went to Mississippi after the incident, not before.  The court instructed the jury to rely on its own recollection of the truth of the statement, not on the statements of the attorneys.  (Tr. III, 338.)  The prosecutor then continued his argument, saying that the first alibi was a lie.  (Tr. III, 339.)

Third, Petitioner objects to the prosecutor's characterization of McIntosh's testimony to the effect that the car had an orange police sticker indicating that it was abandoned.  The prosecutor suggested that McIntosh apparently believed that if a car is abandoned it is available for anyone to take parts.  (Tr. III, 340-41.)  Again, defense counsel objected.  The court overruled the

---

[3]The Michigan Court of Appeals actually applied the more onerous standard of harmless error review, harmless beyond a reasonable doubt, set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967).  On habeas review, the proper standard for harmless error is that set forth in *Brecht*, 507 U.S. at 623, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.*  Nevertheless, the finding that the error was harmless under the more onerous standard necessarily would imply it was harmless under the more lenient standard.

objection, stating that it was an assumption the prosecutor reached from the evidence introduced, and the court instructed the jury that it was up to them to decide whether the assumption was reasonable. (Tr. III, 341.)  The argument was renewed during rebuttal.  (Tr. III, 355-56.)

Fourth, Petitioner argues that the prosecutor, despite earlier being admonished not to impermissibly comment on Petitioner's right to remain silent, again raised the issue during rebuttal argument, stating as follows:

> Few things here.  Mr. Grace got upset about allegedly I'm shifting the burden.  I've always told you the burden rests with me.  What upset me is to watch the defendant, while the victim is up here testifying, shake his head, making comments.  I know you could see it and I know you could hear it.  And that's improper.

(Tr. III, 355.)

Finally, Petitioner complains that the prosecutor improperly argued, "If you can't even be truthful about [stealing parts], what can you be truthful about?  Nothing."  Petitioner reiterates that the prosecutor's assertion that Petitioner and McIntosh were stealing parts is not supported by the evidence.

The Michigan Court of Appeals addressed the Petitioner's varying complaints about closing and rebuttal arguments in detail:

> Defendant also argues that there were numerous instances of prosecutorial misconduct during the prosecutor's closing and rebuttal argument.
>
> Generally, prosecutors are accorded great latitude regarding their arguments and conduct.  They are free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case.  *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995).  In addition, a prosecutor is not required to state inferences or conclusions in the blandest terms possible.  *People v Launsburry*, 217 Mich App 358, 361; 551 NW2d 460 (1996).  Emotional language may be used during closing argument and is "an important weapon in counsel's forensic arsenal."  *People v Ullah*, 216 Mich App 669, 678-679; 550 NW2d 568 (1996).

- 23 -

A.   The preserved claims of prosecutorial misconduct

First, defendant argues that the prosecutor improperly distorted facts in order to cast doubt on defendant's alibi.   Specifically, he claims that the prosecutor's comment that defendant lied when he gave his first alibi to police was unsupported by the evidence.   We disagree.   The prosecutor's comment that defendant lied about his first alibi was not improper in light of the testimony of Detective Postma, who stated:

> I believe initially he [defendant] told me he was in the hospital, and *after he was released from the hospital he had left for Mississippi*. But as I questioned him a little further about Mississippi and where he was going, whose car he was driving, what route he had taken, that story kind of fell through, and he admitted he had lied about Mississippi and he wasn't there.   [Emphasis added.]

The shootings in this case occurred after defendant was released from the hospital. Based on Postma's testimony, the prosecutor's argument that defendant lied about his first alibi when he said he was in Mississippi was not a distortion of the facts in evidence.

Defendant also objected when the prosecutor argued that one of the witnesses believed that the presence of a police sticker allows access to and theft from a vehicle.   At trial, the witness about whom the prosecutor was talking testified that if the victim's car did not have a police abandoned sticker on it, he would not have been tampering with it.   This testimony, taken in conjunction with testimony that the victim saw defendant and the witness tampering under the hood of his car and that parts had been removed from his car, supports the inference made by the prosecutor. The prosecutor's comment was not based on fabricated facts, contrary to defendant's argument on appeal.   Keeping in mind that the prosecutor was not required to state his inferences in the blandest possible terms, we find that his comment was a reasonable inference based on the evidence.   Moreover, even if the inference was a stretch, it was based on evidence and did not deprive defendant of a fair trial.

B.   The unpreserved claims of prosecutorial misconduct

Defendant raises numerous unpreserved claims of prosecutorial misconduct arising out of comments made by the prosecutor during closing and rebuttal argument.   Appellate review of the unpreserved claims of prosecutorial misconduct is precluded unless the prejudicial effect could not have been cured by a cautionary instruction or if the failure to consider the issue would result in a miscarriage of justice.   *People v Nimeth*, 236 Mich App 616, 626; 601 NW2d 393 (1999).   We find that, with the exception of one of the unpreserved issues of prosecutorial misconduct,

which is discussed below, our failure to review will not result in the miscarriage of justice. We also note that the allegedly improper comments were either reasonable inferences drawn from the evidence or were otherwise proper argument.

One unpreserved error warrants review. During his closing argument, defense counsel stated that the prosecutor had tried to shift the burden of proof. Counsel was referring to the prosecutor's statement implicating defendant's right to remain silent. On rebuttal, the prosecutor stated:

> Few things here. Mr. Grace got upset about allegedly I'm shifting the burden. I've always told you the burden rests with me. *What upset me is to watch the defendant, while the victim [sic] is up here testifying, shake his head, making comments. I know you could see it and I know you could hear it. And that's improper.* [Emphasis added.]

We agree with defendant that the italicized comment was patently inappropriate. The comment did not relate to the prosecutor's theory of the case and was not a comment on the evidence or reasonable inferences from the evidence. *Bahoda*, *supra* at 282. It was a gratuitous attack on what the prosecutor perceived to be the improper conduct of the defendant during the trial. Although we find that the comment was improper, we do not find that it constitutes error requiring reversal. Defendant has not shown that a cautionary instruction would not have cured any prejudice or that the comment, in and of itself, deprived him of a fair trial.

(4/28/00 MCOA Op. at 3-4.)

As previously noted, the factual findings of the court of appeals are entitled to a presumption of correctness unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Sumner*, 449 U.S. at 546; *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. The findings in issue clearly were reasonable in light of the evidence presented at trial. Accordingly, the court of appeals reasonably determined that prosecutor's comments regarding the first alibi and McIntosh's belief that it was alright to steal from an abandoned vehicle were proper. Further, the comments in any event could not rise to the level of prosecutorial misconduct because they cannot be said to have "'so infected the trial with unfairness as to make the resulting conviction a denial of

due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). Accordingly, Petitioner is not entitled to habeas relief on this claim.

The remaining claims were reviewed only for manifest injustice because counsel failed to raise an objection at trial. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001), *cert. denied*, 535 U.S. 940 (2002), *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice." *Hicks*, 377 F.3d at 551; *see Murray v. Carrier*, 477 U.S. 478, 495 (1986)) (specifying that a 'fundamental miscarriage of justice' will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent."). A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the

asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's unpreserved claims of prosecutorial misconduct. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee*, 534 U.S. at 385. Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright*, 433 U.S. at 87-88; *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Further, even when the state court reviews the issue under a manifest injustice standard or to prevent a miscarriage of justice, Petitioner's failure to object is still considered a procedural default. *See Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)). As a result, despite the Court of Appeals' decision to review the comment regarding Petitioner shaking his head and making comments, that review was strictly for miscarriage of justice, and it therefore does not undermine the procedural default.[4] Accordingly, review by this Court is barred unless Petitioner can show cause and prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

---

[4]Even were the review considered a review on the merits, the claim would fail. As the court of appeals noted, the comment, though inappropriate, was not so prejudicial as to deprive Petitioner of a fair trial. The standard applied by the court is not dissimilar to the standard for a prosecutorial misconduct violation – whether the alleged prosecutorial misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quotations omitted). The court of appeals decision that Petitioner was not denied a fair trial was a reasonable application of controlling federal law.

To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Petitioner has not attempted to explain the failure to object to the prosecutor's remarks. Although the ineffective assistance of trial counsel may constitute sufficient cause to excuse a default, to serve as cause, the claim of ineffective assistance of counsel must itself be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell*, 274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). Although Petitioner raised the ineffective assistance of trial counsel in his state court appeals, he did not identify the failure to object to closing and rebuttal arguments as a basis for the claim. Ineffective assistance of counsel, therefore, may not serve as cause to excuse the default.

Where a petitioner fails to show cause, a court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 198).

Accordingly, because Petitioner's unpreserved claims of prosecutorial misconduct are procedurally barred, his application for habeas review should be denied.

## IV.   Ground 4: <u>Juror Misstatements</u>

Petitioner next argues that he was denied a fair trial by misstatements made to the jury by one of the jurors. During deliberations, the jury sent a note to the court stating that the evening before a juror had witnessed Petitioner being driven away by deputies and that Petitioner was "making laughing gestures and pointing at [the juror]." (Tr. IV, 386.) After the jury returned its verdict, the jury was returned to the jury room. The court then placed on the record the substance of earlier in-chambers discussions, during which it was decided that the juror would be questioned

individually after the verdict was returned to determine what precisely had occurred, to see if it had

an effect on the juror's verdict, and to determine whether he had shared the information with the

other jurors.  (Tr. IV, 387-89.)  Petitioner denied that the incident had occurred, stating that he was

handcuffed behind his back and could not have made the gestures the juror alleged.  (Tr. IV, 390.)

The juror was sworn and was asked a number of questions by the court.  He testified that he had

mentioned the incident that morning in a casual way.  According to the juror, the other jurors

concluded that the judge should be advised of the incident.  No further discussion occurred. The

juror testified that the incident had no impact on the verdict; the jury decided the matter on the

evidence alone.  (Tr. IV, 389-90.)  Both deputies reportedly confirmed Petitioner's statement.  (Tr.

IV, 390.)  Defense counsel placed on the record his earlier request that the juror be examined before

the verdict, in order to determine whether the incident had been published to the jury.  On the basis

of the juror's testimony after the verdict, together with the prosecutor's earlier improper reference

to Petitioner's failure to testify, defense counsel moved for mistrial.  (Tr. IV, 393-94.)

       The court then recalled the entire jury into the courtroom to ask the jurors to indicate

whether the information they received about the incident had any bearing at all on the verdict.  No

juror indicated that it had an impact.  (Tr. IV., 394-95.)  The court found that, based on the juror's

testimony and the response by the jury to the court's question, the alleged incident played no role in

the jury's decision and the jury based its verdict solely on the evidence.  The court therefore denied

Petitioner's motion for mistrial.  (Tr. IV, 394-95.)

       Petitioner moved for a new trial following sentencing, and the trial court again

considered the juror's conduct.  The court specifically found that, in light of the evidence that his

hands were cuffed behind his back, Petitioner could not have made the gestures described by the

juror.  Nevertheless, the court concluded that the demeanor and testimony of the juror indicated that the incident was extremely minor and that it did not affect either the specific juror or the jury as a whole in reaching its decision.  The court therefore found that a new trial was not warranted. (2/11/99 Cir. Ct. Op. at 3-4.)

> The Michigan Court of Appeals rejected Petitioner's claim on appeal as follows:

> Defendant next argues that the jurors were told that defendant allegedly pointed and laughed at one of the jurors during deliberations and that reversal is warranted as a result of this "extraneous influence."  We disagree.  Defendant has failed to show that this extraneous influence was related to a material aspect of the case or that there was a direct connection between the extrinsic influence and the adverse verdict.  Thus, we find that there was no error requiring reversal.  The trial court did not abuse its discretion when it denied defendant's motion for mistrial on this ground.

(4/28/00 MCOA Op. at 4.)

> "The Sixth Amendment's right to trial by jury 'is designed to ensure criminal defendants a fair trial by a panel of impartial, indifferent jurors.'"  *United States v. Orlando*, 281 F.3d 586, 596 (6th Cir. 2002) (quoting *United States v. Davis*, 177 F.3d 552, 556-57 (6th Cir. 1999) (internal quotation marks and citations omitted)).  Four principles govern claims of extraneous, prejudicial influences on a jury: (1) when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held; (2) no presumption of prejudice arises from such a contact; (3) the defendant bears the burden of proving actual juror bias; and (4) juror testimony at the "*Remmer* hearing" is not inherently suspect.  *United States v. Zelinka*, 862 F.2d 92, 95-96 (6th Cir. 1988) (referring to *Remmer v. United States*, 347 U.S. 227 (1954)).  The Supreme Court in *Smith v. Phillips*, 455 U.S. 209 (1982), concluded that a juror in a criminal trial who had submitted a job application to the local district attorney's office received extraneous information. The Court held,

however, "that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215.   A new trial will not be necessary every time a question of juror partiality is raised. *Id.* at 217.   Where a colorable claim of extraneous influence has been raised, however, a "*Remmer* hearing" is necessary to provide the defendant with "the opportunity to prove actual bias." *Id.*   In *Remmer*, 347 U.S. 227, a juror was offered money in exchange for a favorable verdict. The Court held that a hearing was required to "determine the circumstances, the impact thereof upon the juror, and whether or not [they were] prejudicial." *Id.* at 230.[5]  *See also Nevers v. Killinger*, 169 F.3d 352, 373 (6th Cir. 1999), *overruled on other grounds by Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000) ("When a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury, due process requires that the trial court take steps to determine what the effect of such extraneous information actually was on that jury."); *United States v. Rigsby*, 45 F.3d 120, 124-25 (6th Cir. 1995) ("When there is a credible allegation of extraneous influences, the court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated.")

_____

[5]In the trial court, the prosecutor expressed some uncertainty as to whether the influence in issue constituted an internal part of the deliberations, which would not be subject to inquiry, or whether it was extraneous, requiring the court to inquire of the jury about its deliberations. (Tr. IV, 391-92.)  *See, e.g., Mattox v. United States*, 146 U.S. 140, 149 (1892) ("[T]he evidence of jurors, as to the motives and influences which affected their deliberations, is inadmissible either to impeach or to support the verdict.  But a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence . . . ."); *Tanner v. United States*, 483 U.S. 107, 118-20 (1987) (distinguishing between questions that are internal to deliberations, such as physical or mental incompetence of juror, which is not subject to post-conviction inquiry, and extrinsic influences that may have tainted the jury); *United States v. Herndon*, 156 F.3d 629, 634 (6th Cir. 1998) (discussing importance of distinguishing internal from extraneous jury influences). Here, the trial court decided to inquire of the jury, treating it as an extraneous influence.  The court of appeals also treated the influence as extraneous.  *See Remmer*, 347 U.S. at 229 (holding that contact with a juror about the pending matter is extraneous, warranting inquiry); *see also Smith*, 455 U.S. at 219-20 (holding that a juror's application to prosecutor's office for employment is extraneous and violates due process when it affects the trial).  For purposes of this analysis, I assume that the juror's description of the incident to the other jurors constituted an extraneous influence and therefore required inquiry into the impact on the jury.

Here, the trial court was faced with the somewhat unusual circumstance of becoming aware of the extraneous information before the jury reached its verdict. As a result, no separate *Remmer* hearing needed to be requested or called. Instead, immediately after the verdict and on defense counsel's request, the court questioned both the individual juror and the jury as a whole to determine the existence of actual bias. The court specifically found that both the juror and the jury were credible in their representations that the incident had not affected the deliberations and that the jury had reached its decision solely on the evidence in the case. The Michigan Court of Appeals found that the trial court had not abused its discretion in denying a mistrial.

The decision of the state courts constituted a reasonable application of clearly established Supreme Court precedent. As contemplated by *Remmer*, the trial court properly inquired into the impact of the incident on the conduct of the juror and the impact of the juror's experience on the jury determination. The court made explicit factual findings that, based on what the juror had stated and the response of the jury as a whole to the court's inquiry, the incident had no bearing or influence on the jury's decision, which was based only on the evidence. (Tr. IV, 395.) The court's findings are subject to a presumption of correctness, 28 U.S.C. § 2254(e)(1), and those findings are firmly supported by the record evidence. Accordingly, the state courts' denial of a mistrial based on juror misconduct was entirely reasonable.

V.      Ground 5: Denial of New Trial and Appointment of Investigator

Petitioner next asserts that he was denied his due process right to a fair trial and appeal because both the trial court and the court of appeals improperly denied his motions for an evidentiary hearing and the appointment of an investigator. Petitioner reported that, while the jury was deliberating, he had a conversation in the courtroom with a Mr. Donald Martin. Martin

- 32 -

allegedly told Petitioner that his girlfriend, one of the jurors, was being pressured by the other jurors to vote for a guilty verdict, though she did not believe Petitioner was guilty.  Petitioner claims that, together with the fact that the verdict was not supported by the great weight of the evidence, the pressure on the juror required the appointment of an investigator and an evidentiary hearing.

The Kent County Circuit Court, upon review of Petitioner's motion for new trial, found that no investigator or evidentiary hearing was necessary.  The court reasoned that, in considering the earlier question of extraneous juror influence, the court already had accepted as true Petitioner's version of the incident, which was fully supported by the deputies.  The court therefore concluded that an investigator or evidentiary hearing was not required to determine whether the extraneous influence had occurred.  (2/11/99 Cir. Ct. Op. at 5.)  In addition, the court held that possible coercion of a juror by other members of the jury was not the proper subject of an investigation because it constituted inquiry into internal jury deliberations.  (2/11/99 Cir. Ct. Op. at 4.)

The Michigan Court of Appeals did not fully address the issue, stating only that its prior denial of a remand was controlling under state law:

> Defendant also argues that we should remand for an evidentiary hearing and the appointment of an independent investigator.  However, another panel of this Court denied defendant's motion to remand that was based on the precise grounds asserted here.  As such, defendant's request for a remand amounts to a motion for rehearing, which is not only untimely, MCR 7.215(G), but is also improper because it merely reiterates the same issues previously ruled upon by this Court.  MCR 2.119(F)(3).

(4/28/00 MCOA Op. at 5.)  The decision, however, clearly states that the court considered the merits of the claim in its earlier denial of the motion for remand.

The state-court denial of an investigator and an evidentiary hearing was a reasonable application of established Supreme Court precedent.  As previously discussed, a court ordinarily may not inquire into internal jury deliberations.  *See Mattox*, 146 U.S. at 148-49 (stating general rule and exception for extraneous influences); *Tanner*, 483 U.S. at 118-20 (distinguishing circumstances that constitute influences internal to deliberations, such as physical or mental incompetence of juror, which are not subject to post-conviction inquiry, and extraneous influences that may have tainted the jury); *Herndon*, 156 F.3d at 634-35.   As early as 1915, the Court discussed the importance of shielding jury deliberations from scrutiny:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.  Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict.   If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation – to the destruction of all frankness and freedom of discussion and conference.

*McDonald v. Pless*, 238 U.S. 264, 267-68 (1915), *quoted in Tanner*, 483 U.S. at 119-120.  The Supreme Court has upheld in the face of a constitutional challenge the application of FED. R. CIV. P. 606(b), which prohibits juror testimony as to any matter occurring during the course of the jury's deliberations, except as to extraneous prejudicial information.  *Tanner*, 483 U.S. at 126-27.

Here, the influences in question undoubtedly were internal to the jury's deliberative process.  *See United States v. Gonzalez*, 227 F.3d 520, 525-27 (6th Cir. 2000) (inquiry not required or allowed of juror who claimed that the jury improperly deliberated and coerced her decision).  Admissible evidence of juror coercion could only come from one of the jurors.   Under established Supreme Court authority, inquiry into the jury deliberations about internal deliberative matters would

be improper.  As a result, Petitioner was not entitled to an investigation and evidentiary hearing on the matter.  The decisions of the Michigan courts to deny the appointment of an investigator and an evidentiary hearing therefore were constitutionally proper.[6]

VI.     Ground 6: <u>Cumulative Error</u>

Petitioner argues in his brief that even if all of the errors he asserts are considered to be harmless, their cumulative effect tainted the trial to the extent that his due process rights were violated. Although Sixth Circuit precedent supports the proposition that errors that are harmless in isolation may require reversal when taken together, *see United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000); *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir.1983), no United States Supreme Court precedent recognizes the cumulative error doctrine. Under AEDPA, a court only may grant habeas relief based on misapplication of Supreme Court law.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  Because Petitioner's theory that errors can be considered in the aggregate depends on non-Supreme Court precedent, this claim is without merit.  *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004).  However, were I to consider the purported errors in the aggregate, I would nevertheless find them harmless in this case, for the reasons stated.

VII.    Ground 7: <u>Disproportionate Sentence</u>

Petitioner asserts that his minimum sentence of 20 years was disproportionate to the nature of the offense.  In his briefs before the Michigan appellate courts, Petitioner did not raise a claim under the Eighth Amendment; rather, he claimed that his sentence was disproportionate under

---

[6]Moreover, as expressly found by the Kent County Circuit Court, the appointment of an expert and an evidentiary hearing would be unnecessary on the issue raised in ground four of the petition, in light of the court's express finding that the Petitioner's version of the incident was correct.  Development and presentation of additional evidence therefore could not have altered the result.

the analysis enunciated by the Michigan Supreme Court in *People v. Milbourn*, 461 N.W.2d. 1 (Mich. 1990).  Under *Milbourn*, the sentencing court must exercise its discretion within the bounds of the Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender.  *Milbourn*, 461 N.W.2d at 9-10.  It is plain that *Milbourn* was decided under state, not federal, principles.  *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at *2 (6th Cir. April 21, 1995); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994).  In addressing a claim that a sentence violated *Milbourn* proportionality, the Sixth Circuit previously has stated that the issue is a matter of state law and that there exists "no violation of a constitutional right because the United States Constitution contains no strict proportionality guarantee."  *Lunsford*, 1995 WL 236677, at *2 (citing *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991) and *United States Hopper*, 941 F.2d 419, 422 (6th Cir. 1991)); *Terry v. Trippett*, No. 94-2077, 1995 WL 469424, at *1 (6th Cir. Aug. 7, 1995) (same).  Thus, Petitioner's proportionality claim is solely an issue of state law that is not cognizable in a habeas corpus action.  *See Estelle*, 502 U.S. at 68.

Because Petitioner failed to present an Eighth Amendment claim before the Michigan appellate courts, the exhaustion requirement is not satisfied.  Even were the issue exhausted, however, any claim brought under the Eighth Amendment would be meritless.  The United States Constitution does not require strict proportionality between a crime and its punishment.  *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991); *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment."  *Marks*, 209 F.3d at 583.  A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'"  *Austin v.*

*Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)).  Furthermore, "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole."  *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).  Petitioner was not sentenced to death or life in prison without the possibility of parole. Therefore, Petitioner's sentence does not run afoul of the Eighth Amendment's ban of cruel and unusual punishment.

VIII.    Ground 9: <u>Ineffective Assistance of Trial Counsel</u>

In his ninth ground for habeas relief, Petitioner asserts that trial counsel was ineffective in several broad respects: (1) counsel failed to object to crucial statements and evidence during both the preliminary examination and the trial; (2) counsel failed to present a proper defense and failed to protect Petitioner's right to a fair trial during both the preliminary examination and the trial; (3) counsel failed adequately to investigate the case or to identify and locate a known res gestae witness identified in the police report as "Neighbor."

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, a petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 687. Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also*

- 37 -

*Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). A court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. Both prongs of the *Strickland* test involve mixed questions of law and fact. *Id.* at 698. Where counsel's performance did not fall below an objective standard of reasonableness, the court need not reach the question of prejudice. *See United States v. Foreman*, No. 01-3892, slip op. at 8-9 (6th Cir. March 25, 2003).

In addressing Petitioner's claim on appeal, the court of appeals concluded that "[t]he record fails to support defendant's allegations of ineffective assistance of trial counsel. Moreover, we noted that defendant has failed to overcome the presumption that the challenged actions were sound trial strategy." (4/28/00 MCOA Op. at 5.)

The state court's determinations constituted a reasonable application of *Strickland*. Plaintiff complains that defense counsel was ineffective when he failed to object to the prosecutor suggesting to witness Wilson, "You have to answer yes?" The context of the question, however, makes it clear that the prosecutor was responding to the witness's nonverbal assent and instructing him to make a consistent verbal response. The failure to object therefore was entirely reasonable.

Petitioner also asserts that counsel improperly failed to object at trial to witness identifications on the basis of an improper photo array. As the court of appeals observed, Plaintiff did not bear his burden to overcome the presumption that counsel's decision was strategic. Defense counsel concentrated his defense on Wilson's and Jones' incentive to fabricate the charge against

Petitioner. Both witnesses identified another person during the first 45 minutes after police contact. Both originally lied about having beaten Petitioner earlier that day. In reviewing the photo array, Wilson first identified another man before identifying Petitioner. Defense counsel could well have determined that the complainants' identifications from photographs cast doubt on their veracity and should be introduced and subjected to cross-examination. As a consequence, the state court decision that counsel's actions were presumptively strategic did not constitute an unreasonable application of Supreme Court precedent.

Petitioner next objects that counsel was ineffective for failing to investigate the identity of a neighbor mentioned in a police report who purportedly stated that the shooter was "Jeb" or "Jed" Williams. Instead, counsel moved to exclude any testimony regarding the statement because it constituted hearsay. As a result, the identification did not come into evidence. Petitioner's argument is both contradictory and meritless. Counsel undoubtedly made a strategic decision not to seek to introduce the testimony of a witness who identified the shooter as someone with nearly the same name as Petitioner. Petitioner's alternate argument that counsel "fabricated" the name mentioned in the report in making his motion, referring to "Jeff Wilson" rather than "Jeb Williams," is equally meritless. Whether the name as transcribed was actually misstated or merely a transcription error is an open question. Regardless, as I previously have indicated, the record reflected Petitioner's name, "Williams," and counsel reasonably elected not to proffer testimony that could be viewed as an additional identification of Petitioner. The state court's determination was patently reasonable.

Petitioner's contention that counsel failed to formulate a meaningful defense also is without merit. Counsel's defense was clear, rational and consistent – Petitioner did not and could

not have committed the offense, and the complaining witnesses had ample reason to falsely identify Petitioner out of fear of being charged for brutally assaulting Petitioner. The state court finding that counsel was not ineffective was entirely reasonable.

In his final claim for ineffective assistance, Petitioner contends that counsel erred when he failed to object to the fact that victim John Jones was not present at the preliminary examination. Petitioner cites no authority for his claim that any legal rule, constitutional or otherwise, required the presence of Jones at the preliminary examination. The prosecutor was required only to introduce sufficient evidence to support the district court's finding of probable cause to believe the crime had been committed by Petitioner. Wilson's eyewitness evidence was sufficient to support that finding, regardless of Jones' presence to support the testimony. Petitioner fails to demonstrate any attorney error.

In sum, the determination of the state court constituted a reasonable application of clearly established Supreme Court precedent.

IX. Grounds 8, 10, 11, 13: <u>Unpreserved Claims Raised in Pro Per Brief on Appeal</u>

In his eighth ground for habeas relief, Petitioner contends that the state court abused its discretion when it permitted the amendment of the information at the preliminary hearing to include a second charge of assault with intent to commit murder against Keith Wilson. Petitioner contends that the improper amendment created a structural or procedural defect in the proceedings that denied his right to a fair trial. In ground ten, Petitioner asserts that the prosecution failed to produce the neighbor mentioned in the police reports as a *res gestae* witness, allegedly in violation of Petitioner's right to due process. Petitioner's eleventh ground asserts that the trial court demonstrated bias when it allowed a juror's "perjured" statement to be discussed during jury

- 40 -

deliberations.  Finally, in ground thirteen, Petitioner objects to the suggestiveness of the photo lineup, in which his photograph allegedly was reproduced in a larger size than the others.

Petitioner first raised all four issues in his *pro per* brief on appeal and thereafter in his application for leave to appeal to the Michigan Supreme Court.  The Michigan Court of Appeals did not address the merits of the issues.  Instead, the court held that the issues raised in Petitioner's *pro per* brief on appeal were not preserved at trial and that Petitioner had failed to demonstrate plain error affecting substantial rights.  (4/28/00 MCOA Op. at 5.)

As previously discussed, when a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst*, 501 U.S. at  801; *Engle*, 456 U.S. 107.  To determine whether a claim is barred by procedural default, the Court must consider whether (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks,* 377 F.3d at 551.  To obtain review of his procedurally defaulted claim, Petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice."  *Hicks*, 377 F.3d at 551; *see Murray*, 477 U.S. at 495.

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's unpreserved  claims that the information was improperly

amended.[7] That rule was well established at the time of Petitioner's trial, *see, e.g.*, *Kelly*, 423 Mich. at 271, and constituted an adequate and independent state procedural ground for decision. *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d at 84. Although the state court reviewed the issue to prevent a miscarriage of justice, the issue is still considered procedurally defaulted. *Paprocki*, 869 F.2d at 284-85; *Coe*, 161 F.3d at 330. Accordingly, review by this Court is barred unless Petitioner can show cause and prejudice. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 485.

Petitioner has made no effort to demonstrate cause for the default. Although the ineffective assistance of trial counsel may constitute sufficient cause to excuse a default, to serve as cause, the claim of ineffective assistance of counsel must itself be properly exhausted. *Edwards*, 529 U.S. at 453; *Buell*, 274 F.3d at 349. Petitioner raised the ineffective assistance of trial counsel in his state court appeals. He did not, however, claim that counsel was ineffective for failing to object to the amendment of the information or that counsel impermissibly failed to object to the trial court's alleged bias. Ineffective assistance of counsel, therefore, may not serve as cause to excuse the default with respect to those two claims. Although Petitioner did raise ineffective assistance of counsel challenges to the remaining two issues, as I previously noted, Petitioner failed to demonstrate that counsel's performance did not constitute reasonable trial strategy. As a consequence, the ineffective assistance of trial counsel cannot constitute cause for the defaults.

Where a petitioner fails to show cause, a court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir.

---

[7]I note that not only did Petitioner not object to the amendment to the information, counsel stipulated to that amendment at the preliminary examination.

1985). Accordingly, because Petitioner's unpreserved claims are procedurally barred, I recommend that his application for habeas review on those grounds be denied.

X. Grounds 12 and 15: <u>Ineffective Assistance of Appellate Counsel</u>

In grounds twelve and fifteen, Petitioner raises claims of ineffective assistance of appellate counsel. In ground twelve, which Plaintiff raised in his supplemental brief on direct appeal, Plaintiff broadly claims that counsel should have raised additional issues that would likely have resulted in his acquittal. Although Petitioner's argument is vague, he appears to suggest that counsel's failure to raise on appeal all of the claims Petitioner suggested amounted to ineffective assistance of appellate counsel. The claims to which Petitioner refers in this ground appear to be those he raised in his *pro per* supplemental brief on appeal, which were considered and addressed by the Michigan Court of Appeals on direct appeal:

> Finally, we have reviewed defendant's allegations of error found within his Standard 11 brief on appeal. . . . Similarly, we find that defendant has failed to demonstrate that his appellate counsel's performance was seriously deficient, nor has he overcome the presumption that appellate counsel's decisions with regard to which claims to pursue on appeal was sound trial strategy. *People v Hurst*, 205 Mich App 634, 641-42; 517 NW2d 585 (1994). The remainder of the issues raised in defendant's brief are unpreserved and defendant has failed to show the existence of any plain errors that affected his substantial rights. *People v. Carines*, 460 Mich 750, 763-64; 597 NW2d 130 (1999). Thus, we find that defendant has not raised any errors requiring reversal.

(4/28/00 MCOA Op. at 5.)

Petitioner's claim of ineffective assistance of appellate counsel as raised in ground twelve is without merit. An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on 'those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate

- 43 -

advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* at 289.

As a result, even if some of the issues Petitioner wished to have raised by counsel were colorable, the failure to raise the issues would not constitute ineffective assistance absent a showing that such issues were demonstrably superior to those raised. Here, Petitioner makes no effort to make such a showing. Indeed, Petitioner only vaguely suggests the substance of his claim.

Further, even should the issues have been raised by counsel, Petitioner fails to show that counsel's deficient performance prejudiced Petitioner and resulted in an unreliable or fundamentally unfair outcome. *Strickland*, 466 U.S. at 687. Petitioner himself raised the issues he now contends should have been raised by counsel. The Michigan Court of Appeals considered the issues and found them meritless. The state-court determination undermines any claim of error on the part of counsel and also demonstrates that counsel's refusal to raise the issues did not prejudice Petitioner. Petitioner's twelfth ground for relief therefore is meritless.

In ground fifteen, Petitioner raises a separate claim of ineffective assistance of appellate counsel, in this instance identifying two specific errors: (1) that counsel failed to argue that the prosecution did not comply with the discovery order, which prevented trial counsel from

- 44 -

identifying the res gestae witness; and (2) prosecutorial misconduct. Ground fifteen was raised for the first time in his motion for relief from judgment. That motion was denied by the trial court on the grounds of MICH. CT. R. 6.508(D)(2) and (D)(3). Both the court of appeals and the Michigan Supreme Court denied leave to appeal because Petitioner had failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).

As previously discussed, when a state prisoner has "defaulted his federal claim in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claim is barred" unless the petitioner can show cause for the default and prejudice because of it, or a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551. Under MICH. CT. R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal. For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." MICH. CT. R. 6.508(D)(3)(a)-(b). In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence. *Luberda v. Trippett*, 211 F.3d 1004, 1006-1007 (6th Cir. 2000). Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of

Petitioner's action.  *See  Luberda*, 211 F.3d at 1007; *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998).

   Moreover, this case is unlike *Caver v. Straub*, 349 F.3d 340, 346-47 (6th Cir. 2003), in which the Sixth Circuit concluded procedural default did not bar consideration of a petitioner's ineffective assistance of appellate counsel claim that was raised for the first time in his motion for relief from judgment. The *Caver* court held that, notwithstanding the Michigan Supreme Court's denial of the application for relief on the grounds of MICH. CT. R. 6.508(D), the petitioner had not defaulted his claim.  The court held that the petitioner had attempted to raise the issue on direct appeal and had asserted ineffective assistance of appellate counsel as cause for the failure not to raise the issue in his *pro per* application to the Michigan Supreme Court.  As a result, the *Caver* court concluded that because Petitioner had raised the issue at his first opportunity, the claim was not barred by procedural default in the federal courts.  *Id.*

   Here, in contrast, Petitioner actually exercised his right to file a *pro per* supplemental brief on appeal, in which he presented a claim of ineffective assistance of appellate counsel.  In that claim, he recited numerous bases for his claim of ineffective assistance of appellate counsel, though he did not allege the basis he now articulates in ground fifteen of his habeas petition.  Petitioner, therefore, had a full opportunity to raise the instant issues on direct appeal, but failed to do so. Instead, he  raised for the first time the instant claim of ineffective assistance of appellate counsel nearly a year later, when he filed his motion for relief from judgment.  All of the Michigan courts expressly relied upon MICH. CT. R. 6.508(D) in denying relief on his motion for relief from judgment.  As a result, Petitioner's claim is properly considered procedurally defaulted.  Petitioner has made no effort to demonstrate cause or prejudice that would excuse his default, and his claims

fail to demonstrate a fundamental miscarriage of justice.  *See Murray*, 477 U.S. at 495 (holding that a "fundamental miscarriage of justice" results only "where a constitutional violation has probably resulted in the conviction of on who was actually innocent").  I therefore recommend denial of Petitioner's fifteenth claim.

XI.     Ground 14: <u>Miscarriage of Justice</u>

In his final ground for relief, Petitioner contends that Jones and Wilson were granted state immunity from assault charges in exchange for their testimony against Petitioner, yet the agreements were not disclosed to Petitioner and were not subjected to cross-examination and jury instruction.  Petitioner asserts that he was denied his right to due process and a fair trial by the failure to disclose the agreements.

Petitioner's fourteenth ground for habeas relief was raised for the first time on direct review in his application for leave to appeal to the Michigan Supreme Court.  The Michigan Supreme Court denied review.  Petitioner then raised the claim in his motion for relief from judgment.  The Michigan courts denied relief from judgment pursuant to MICH. CT. R. 6.508(D).

As previously discussed, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action.  *See Luberda*, 211 F.3d at 1007; *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998).  Petitioner's claim, therefore, was procedurally defaulted, and this Court is precluded from considering the issue on habeas corpus review, absent a showing of cause and prejudice or a fundamental miscarriage of justice.  *Hicks*, 377 F.3d at 551;  *Murray*, 477 U.S. at 495.  Petitioner has failed either to argue cause or prejudice for his default or to demonstrate a fundamental miscarriage of justice by demonstrating that "a constitutional violation has probably resulted in the conviction of one who was actually innocent."  *Murray*, 477 U.S. at 495.

- 47 -

Even had Petitioner demonstrated cause for his default, his claim would be without merit. In state criminal proceedings, the prosecution is obligated under the Due Process Clause to disclose evidence that is favorable to the accused and material to his guilt or punishment. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987); *McMeans v. Brigano*, 228 F.3d 674, 683-84 (6th Cir.2000). In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court held that the government must disclose a promise of leniency to a witness provided in exchange for testimony by that witness. Similarly, in *Delaware v. Van Arsdall*, 475 U.S. 673, 679-80 (1986), the Court held that the fact that a witness had had a pending charge against him dismissed was evidence "that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony." Calling it a "prototypical form of bias on the part of the witness," the Court held that a refusal to permit a defendant to question the witness about the dismissal of the charge was a violation of the Sixth Amendment right to confrontation. *See also U.S. v. Ware*, 161 F.3d 414, 420 (6th Cir. 1998).

In contrast with the cited cases, however, Petitioner provides absolutely no basis for his claim that Jones and Wilson were granted immunity in exchange for their testimony. Instead, Petitioner merely reargues the bare fact that neither was charged with assaulting Petitioner. The claim that the two received immunity, therefore, is entirely speculative and unsupported. Further, the jury was fully apprised that neither had been charged with assault, despite their admitted beating of Petitioner. As *Van Arsdall* requires, Petitioner was permitted and exercised his right to challenge the veracity of the witnesses about the fact that they were not charged. Accordingly, Petitioner fails to demonstrate a violation of his right to due process.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  May 12, 2005                          /s/ Hugh W. Brenneman, Jr.
                                              Hugh W. Brenneman, Jr.
                                              United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).